Turney, J.,
delivered the opinion of the Court.
The provision in Section 2431 of the Code, that “ Absolute equality shall be observed in the division of the estates of deceased persons, except where a will has been made and its provisions render equality impossible,” is a mere announcement of a rule of law of effective existence without the Statute; and was expressed by 'the Legislature with a view to the estate owned by the deceased at the moment of .his death, and upon the idea that no advancements had been made by him in his lifetime. It was not intended to restrict or enlarge the general rule upon the subject of advancements: i. e. that persons receiving must account for them before participating in a division of the estate of the decedant.
*817 Section 2432, that “All advancements, whether by settlements or otherwise, in the lifetime of the deceased, or by testamentary provisions, shall be collated and brought into contribution in the partition and distribution of the real and personal estate of the deceased ; those in real estate first in the partition of real estate, and those in personal estate first in the distribution of personal estate/’ must be interpreted with reference to the meaning of the term “advancements.” In Cawthon v. Coppedge, 1 Swan, 487, this Court say: “An advancement is a gift by a parent to a child by anticipation, in whole or in part, of what it is supposed the child will be entitled to on the death of the parent.”
"While it is the rule, that money or property given to a child will, prima facie, be an advancement, and must be accounted for in the distribution and partition of estates, under our Statutes; it is also true, and equally well-settled, that such gifts may be shown to have been a mere gift and not intended as an advancement, the onus being upon him who claims it as a gift to show that it was not intended as an advancement. This was clearly the meaning of the Legislature in the passage of the Act of 1858, using language to which this Court had given a technical legal meaning in 1852, in the case referred to. The Act then, interpreted in the light of that definition, must be construed as if it read: “A gift from a parent to a child by anticipation in whole or in part of what it is supposed the child will be entitled to at the death of the parent, shall be collated and *818 brought into contribution in the partition and distribution of the real and personal estate,” etc., etc.
The intention of the donor is to be arrived at from a survey of bis conduct and conversation at or about the time of the gift; and, as said in Morris v. Burroughs, 3 Atkins, 403, “The agreement must depend on the circumstances at the tima, and can not he made better or worse by subsequent facts.”
At the time of the conveyance of the slaves to the three children of a former marriage, it was not only the expressed intention of Joseph Morris that they were not to be charged as advancements, but such was the agreement upon which they were accepted. The gifts being by stipulation not advancements, the negroes will not be accounted for in the distribution of the estate. Such was the decision in Mitchell v. Mitchell, 8 Ala., in the construction of a Statute very similar to ours. The rule does not obtain as to the payments on land for Joel A.: he will be charged therewith. Joel A. is entitled to be credited in his administration by the amount of Confederate money paid to such distributees as would receive it. He will be charged with $800, as that was the proportion to which each was entitled at the time, and he is presumed to have appropriated his share as he was distributing pro rata to others. We are not authorized to determine the extent of the liability of the guardian to the minor, on account of Confederate money received.
Joel A. Morris was appointed and qualified as administrator of his father’s estate on the 1st Monday *819 in April, 1861. He had two years and six months within which to settle the estate. It is customary with the most prudent business men, entirely watchful of their trust, to delay for a time, frequently for six or eight months, and even longer, the institution of suits for the collection of debts due their intestate’s estate; and unless the condition of the debtors is such as to make it an imperative duty to sue at an earlier period, it has never been supposed that this delay was such negligence as would amount to a devastavit. In defining the duties of those sustaining a fiduciary relation, it is not only legitimate, but it is the duty of the Courts to look to the surroundings of such agents, and to the habits and customs of prudent men occupying such positions. We have already remarked upon the latter. What are the surroundings here ? In April, 1861, there was a threatening war prospect, and in two months the State of Tennessee had withdrawn from the Union, put troops in the field, and was ablaze with military preparation. .All manner of business was, in a measure, suspended; and it was expected, aye, demanded in every grade of society, from the humblest artisan to the highest official, that all able to bear arms would renounce their callings and devote themselves exclusively to the defense of the South. In the portion of the State in which this case originated, the young man had no election; but was driven by the inexorable lash of public opinion into the army or a change of residence. Patriotic ardor closed the Courts, and war opened prisons, releasing their inmates to take up arms. And the *820 public mind was in no conditon for routine business in private and civil life.
Under these circumstances it would be the ultimate' of unreason to hold an administrator to that strict accountability asked for; the more especially, when the delay was not beyond that usual in such cases. Coming to a later period, when, ordinarily, it might be-expected of a representative to take action, we find the Courts closed by war; in fact, when that is not the case, the currency has gone into a new and uncertain shape; Confederate notes are issued; bank paper is depreciated, etc., etc.; bringing about the very anomaly illustrated in this record: — i. e., a complaint, 1st. That debtors are not made to pay. 2nd. That they are permitted to pay in a currency that has perished in the hands of the administrator. The same mouths blow hot and cold in the same breath, you shall do, you shall not do. No human foresight could, under the circumstances, have gone clear of the one-evil- or the other. This condition of things was brought about by the Government, and not by the individual.
We have held, that if one acting in a fiduciary capacity, in good faith, received Confederate Treasury notes in discharge of a debt due his principal, he can not be held to account for more than the value of the Confederate money; and, then only, when he has appropriated it to his own use. We re-announce the principle here.
If, when the Courts were opened, after the close of the War, debts were lost to the estate through the fault of the administrator, in not exercising a reason *821 able diligence in tbeir collection, he must account for them.
In Harrison v. Henderson, manuscript opinion, by •Judge Freeman, in which the time allowed to administrators for final settlement is discussed, this Court determined: “In view of this question we thinh the ends of justice will he best subserved by holding, that from the time the Courts were closed no Statute of Limitation shall be operative”: — meaning, of course, that such suspension should continue until the Courts were opened, or until such time as they were put in operation by Legislative enactment. From this rule it follows that an administrator shall be allowed such additional time after the opening of the Courts, as when added to the time which transpired previous to the close, will make the two years and six months allotted him by Statute for a final settlement. An administrator is neither required nor allowed by law to pay distributees until the time allowed by law for creditors to sue shall have elapsed, unless the distributee, assertaining or approximating the value of his share, shall tender a refunding bond with good security and demand payment.
“When the exigencies of an estate require an executor to keep money by him, when he has not unreasonably delayed a settlement of his accounts, when he has made promptly a just and true exhibition of his receipts and disbursements, he is not chargeable with interest on any accidental amount he may have had in his hands, and on which he received no. interest.” 7 Yerg., 172; 10 Yerg., 161. From this rule we *822 are to infer, that if the administrator is in no fault,, and the circumstances are such that he cannot pay out or distribute the fund, then he is not chargeable-with interest. The onus is upon him to show the excuse. It is a well-settled rule that interest will not be charged on advancements.
The property exempt from execution goes directly to the widow on the death of the husband. The representative, as such, can have nothing to do with it. If he interfere with or convert it, he is ' responsible as a wrong-doer in his personal capacity and not upon his bond; hence his sureties are not liable as-such.
On the 3d of July, 1865, the securities of Joel A. Morris, or a portion of them, petitioned to be released: — the proceedings were regular and the order properly made. The effect of the release is to make-file second set of securities primarily liable to the extent of their bond. If they shall prove insufficient,, the first securities are to be responsible up to the date of their release; the second securities will account first,, for any default after their suretyship, and then for-such as may have been before they became security.
The attempt to substitute Malone for McAdams was irregular- and void. McAdams was not released, nor-Malone bound, at least as between Adams and the estate. The cases relied on for the contrary, are cases-where the execution was formal and lawful, but with omissions by the draughtsman or Clerk of the Court.
We intimate no opinion as to what are, or maybe the obligations from Malone to McAdams.
*823 We see no reason to allow' extraordinary compensation to the administrator. He will be allowed reasonable compensation. The Clerk of this Court will re-state the account in accordance with the principles of this opinion.